# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **8:06CR118** |
| vs. | ) | |
| | ) | **REPORT AND** |
| BRIAN FREEMONT, | ) | **RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

An evidentiary hearing was held on June 27, 2006 on the defendant's Motion to Suppress Evidence [11].  The hearing Transcript [28] was filed on July 6, 2006, at which time the motion was deemed submitted.

On January 21, 2006, the defendant, Brian Freemont, was an overnight guest in a room at the Satellite Motel; the room was not registered to Freemont.  Around 9:00 a.m., Omaha police officers responded to a complaint that Freemont had pointed a shotgun at Paula Budlong through the back sliding glass door of the motel room.  Defendant refused to open the door to the room, and a safety lock prevented the officers from fully opening the door with a key provided by management.  The door was eventually forced open.  A warrantless search of the room yielded a shotgun, which was found in a bed, hidden between the box spring and the mattress.  While the officers were trying to force the door open, defendant fled through the sliding glass door.  He was captured shortly thereafter.

Defendant contends that he had a legitimate expectation of privacy in the motel room as an overnight guest, and the warrantless search of the motel room violated his rights under the Fourth Amendment to the U.S. Constitution.

The government argues the motion should be denied because (1) the defendant abandoned any reasonable expectation of privacy when he fled from the room, and (2) the search of the room was permissible due to exigency or as a protective sweep under *Maryland v. Buie*, 494 U.S. 325 (1990).

## FACTUAL BACKGROUND

Omaha Police Officer Lori Schenkelberg testified that she has been an officer for 11½ years and is now a cruiser patrol officer. On January 21, 2006, she and her partner, Officer Jennifer Bart, were dispatched to Satellite Motel to investigate an "armed party disturbance." Officers Fortier and Tomsu assisted as backup officers.

The officers first spoke to the motel manager and asked for Brian Freemont's room number. The manager told them Freemont was in the motel and that the room was registered to a female. Around 9:00 a.m., Officer Schenkelberg spoke to the complaining party, a woman named Paula Budlong, who reported that someone at the Satellite Motel had pointed a shotgun at her.

Ms. Budlong was upset. She told the officers she received a phone call from her daughter, Georgetta "Jetta" Bothwell, at about 3 a.m. Jetta reportedly told Budlong that she was in the trunk of a vehicle being driven by Brian Freemont, and they were going to a small

-2-

town in Iowa.  Budlong said she then called an unknown person from the caller I.D. on the cell phone.  That person told Budlong that they talked to Freemont, who was en route to the Satellite Motel, so Budlong went to the Satellite Motel to look for her daughter.

Ms. Budlong and her male companion knew approximately which motel room the daughter was supposed to be in.  Budlong told the officers that the curtains or the blinds were open on the sliding glass door.  Freemont was standing at the sliding glass door and pointed a shotgun at her through the door.  It was at this time that Budlong called the police.

According to Officer Schenkelberg, pointing a shotgun at someone would constitute an assault in violation of state law or Omaha city ordinance.

The officers, with guns drawn, went to Freemont's room and attempted to make contact.  They knocked loudly on the door and announced that they were police officers. After about five minutes, there was no answer at the door, so the manager gave the officers a room key.  They attempted to open the door with the key, but it was locked at the top and would only open about two inches.  Through the partially-opened door, the officers could see Freemont pacing back and forth.  He was wearing a very large sweatshirt and baggy pants. Freemont said he was not going to let them in and kept going behind doors or a smaller wall on the other side of the room.  Freemont would not tell the officers if the girl was in the room but did tell them there were three people in the room.  Schenkelberg yelled for anybody else to respond, but nobody would.  The officers spent between 15 and 20 minutes trying to

communicate with Freemont and the two other occupants of the motel room. They could not see any guns in plain view.

Officer Schenkelberg testified that Paula Budlong was not sure whether her daughter was in the motel room. As far as Budlong knew, Freemont had Jetta and Jetta had been in the trunk of a car, and Freemont was at the Satellite Motel. Schenkelberg testified on cross-examination that she did not believe there was a hostage in the room.

Freemont then left the motel room through the rear sliding glass door. Officer Schenkelberg could see the sliding glass door through the partially-opened front door. At the time, she was trying to talk to Freemont, who was on his cell phone. He put the cell phone away, moved the curtains or blinds to the side and grabbed the handle. Schenkelberg was attempting to kick the door at the time, so she did not actually see him leave. She alerted Officer Tomsu, who was watching the back door, that Freemont was going to be exiting. Tomsu was not near enough to catch Freemont; however, two other officers who were heading eastbound on L Street in their cruisers caught Freemont near 60th and L Streets. Freemont was captured within five minutes after he left the motel room. He was placed in a cruiser and taken back to the Satellite Motel.

Meanwhile, Budlong's report about her daughter had not been resolved, so the officers returned to Freemont's motel room to find the girl who was, in Officer Schenkelberg's words, "supposedly kidnaped." (17:25). Officer Tomsu entered the motel room through the sliding glass door. Schenkelberg ran around the outside of the building and came in through the

sliding glass door at the same time Tomsu was unlocking the main door from the inside to let Officers Bart and Fortier into the room.

It was Schenkelberg's understanding that Budlong had remained at the motel until law enforcement officers responded to her complaint, and that Freemont remained in the motel room until he tried to escape through the sliding glass door.

According to Schenkelberg, it is typical for police officers to conduct a "protective sweep" under the circumstances presented. They handcuffed the two women found in the room and verified that neither of them was Jetta Bothwell. Schenkelberg stayed with the two women. Officer Tomsu then checked the room for weapons. A shotgun was found in the bed closest to the door, between the box springs and the mattress. It was not in plain view and was the only shotgun found in the room. The bed was the one where the two women had been sleeping. None of the room's occupants said they had seen the gun or knew who put it there.

One of the occupants of the motel room was a woman named Kendra Hubel. Hubel told Officer Schenkelberg that she rented the room and, prior to that, Freemont had picked her up at a different location. Freemont and Hubel then found the third occupant, Nastassa Dutton. The three of them then went to the Satellite Motel. Hubel told Schenkelberg that the three of them were hanging out in the room partying and having a good time. At some point, Freemont left the room and returned. Hubel did not indicate that she had seen Jetta

that night.  Either Hubel or Dutton told Schenkelberg that none of them liked Jetta, and Jetta was probably making up the abduction to get Freemont into trouble.

Apparently, at some point, police officers opened the trunk of Freemont's vehicle. Although she was not present at the time, Officer Schenkelberg recalled hearing that the trunk of the car was completely full of material, so that no one else could have fit in it.

Dawn Suverkrubbe testified that she was at the Satellite Motel on January 21, 2006 around 9 a.m. because Georgetta Bothwell had called her around 3 a.m. and said that somebody had her in a trunk for two days.  According to Suverkrubbe, Jetta was crying and said she was in the trunk of a car for two days and she was at a hotel in Iowa somewhere. Jetta did not know the name of the hotel. Suverkrubbe told Jetta, if she could get out, to get away with a phone or not even worry about the phone, but "get away and run fast and far and try to get help."  Jetta did not name Brian Freemont as the individual who had kidnaped her. Suverkrubbe believed Jetta and tried to called Jetta's mother, Paula Budlong, but Budlong did not answer the phone.  Suverkrubbe left a message.

Suverkrubbe, Budlong and Budlong's boyfriend, Dale, all went to the Satellite Motel, as did "Steve, Big Mike and Shawn."  Suverkrubbe testified that they parked on the left side of the building and got out of the car.  Somebody pointed out something about a man's tennis shoes sitting there, and said that's the room they're in.  Suverkrubbe then banged on the glass doors of Freemont's motel room.  The curtain opened, and she saw a dark-skinned or black man with a gun.  The man appeared to pump the shotgun, prompting Suverkrubbe to hide

behind a brick or cement wall to avoid being shot.  Due to her haste to seek cover, she was not sure whether he actually pointed the gun at her.

Suverkrubbe testified she had met Brian Freemont, identified him in the courtroom, and stated that the man with the gun at the Satellite Motel was not Brian Freemont.  The man she saw was "dark black" and was wearing "a scarf thing."  She described Brian Freemont's skin color as Mexican or light.

Suverkrubbe told Paula and Dale about the person with the shotgun.  According to Suverkrubbe, "everybody was everywhere."  Steve had the lady at the desk call the police.

From her vantage point behind the wall, Suverkrubbe observed the female police officers trying to break down the metal door of the motel room.  She testified that the manager told the officers it was physically impossible to break down the door; it was too strong.  A male police officer then ran by.   At some point, Suverkrubbe went inside the motel building.

Suverkrubbe testified she did not see anybody leave the motel room before the police got there.  She and her companions asked the police officers to open the trunk to make sure Jetta wasn't in the trunk.  Suverkrubbe testified the trunk of the car was full of speakers and there was not room to hold a person in the trunk.

Georgetta "Jetta" Bothwell testified that she did not place a call to her mother or Dawn Suverkrubbe reporting that she was being held hostage.  She has known Brian Freemont for about one year and they were social friends.  On January 21, 2006, she was in Villisca, Iowa

-7-

with some friends at a party.  She denied she was with Brian Freemont on that date or that she was being held against her will.  She had not seen Freemont for four or five days before this happened and had "no clue" why her mother believed she was being held against her will in the trunk of a car and being driven around by Brian Freemont.

Bothwell testified that she had argued with Freemont two weeks earlier about Bothwell and her younger brother taking some things out of Freemont's car.  During the argument, Bothwell "got hit in the mouth, yeah, but, ... it wasn't nothing serious. It didn't draw blood. It didn't leave marks. It didn't do nothing." Four or five days later she ran into Freemont.  He came to her house to say he was "sorry and stuff."  The incident at the Satellite Motel happened a few days after that.

Bothwell admitted that she did call Dawn Suverkrubbe on January 21, 2006, from a campsite in Iowa, but the purpose of the conversation was "to let her know that I was okay 'cause I haven't talked to my mom or nothing for like four days and stuff. I was just calling to let them know that I was okay and I was ready to come back to Omaha and if anybody could come down and get me."  She denied calling her mother and stated that she did not have her mother's telephone number.  According to Bothwell, Suverkrubbe was the one who brought up the story about Bothwell being in the trunk of a car at 60th and L at the motel. Bothwell thought the story was funny and told Suverkrubbe that she was not in the trunk of a car.  This conversation occurred while Suverkrubbe, *et al.*, were getting ready to go to the Satellite Motel.

-8-

# LEGAL ANALYSIS

## A.  Expectation of Privacy

At issue in this case is whether defendant Freemont abandoned any expectation of privacy in the motel room and its contents when he fled from the police.  The defendant bears the burden of showing he is entitled to challenge the search of the room.

> Fourth Amendment rights are personal and cannot be asserted vicariously. *See United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994).  A defendant who "fails to prove a sufficiently close connection to the relevant places or objects searched ... has no standing to claim that they were searched or seized illegally." *Id*. A defendant moving to suppress evidence has the burden of showing a legitimate expectation of privacy in the area searched. *See id*. "Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case." *Id*.

*United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000).

In *Rakas v. Illinois*, 439 U.S. 128 (1978), the Supreme Court reasoned that the proper fourth amendment focus should be whether the defendant has a legitimate expectation of privacy in the searched premises and that the defendant has the burden of establishing a legitimate expectation of privacy.  In *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990), the Court held that one's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." However,  "[t]he extent to which the Amendment protects people may depend upon where those people are . . . . [a]nd an expectation of privacy in commercial property is different

from, and less than, a similar expectation in a home." *Minnesota v. Carter*, 525 U.S. 83, 84 (1998).

It is a well-settled rule that a guest in a hotel/motel room is entitled to constitutional protection against unreasonable searches and seizures. *Stoner v. California*, 376 U.S. 483 (1964). This protection, however, ends when a person is no longer considered a guest. For example, the Eighth Circuit has concluded that a defendant lacks standing to challenge the search of a motel room which takes place after checkout time has expired. *United States v. Perez-Guerrero*, 334 F.3d 778 (8th Cir. 2003). *See also United States v. Larson*, 760 F.2d 852 (8th Cir.), *cert. denied*, 474 U.S. 849 (1985) (defendant lacked a reasonable expectation of privacy where he had never checked into the room, and the registered guest who had checked in had also checked out before the search); *United States v. Rambo*, 789 F.2d 1289 (8th Cir. 1986) (no standing to contest officers' entry into hotel room after rental period has terminated).

In *United States v. Caballero-Chavez*, 260 F.3d 863 (8th Cir. 2001), *cert. denied*, 535 U.S. 972 (2002), a case originating in this district, a third party rented a motel room for the use of the two defendants. The third party was approached by police officers, who had been informed that a drug delivery would occur at the motel that night. The officers went to the room in question, but no one responded. The third party, who had actually rented the room, gave the officers permission to enter and search it. The officers found seven kilogram bricks of cocaine hidden behind a wood panel under the bathroom sink. When confronted, the two

-10-

defendants denied any claim to the room or the property therein.  This court denied their

motions to suppress, finding, *inter alia*, that the defendants abandoned their interest in the

motel room and its contents.  The Eighth Circuit affirmed the decision on that ground:

> If the defendants abandoned their interests in Room 222 and its contents,
> they no longer had legitimate expectations of privacy and are precluded from
> challenging the search of the room or the duffel bag on Fourth Amendment
> grounds.  *See United States v. Hoey*, 983 F.2d 890, 892 (8th Cir. 1993).
> Whether property has been abandoned is a question of fact we review for clear
> error.  In conducting that review, we "look to the totality of the circumstances,
> noting in particular two factors:  whether the suspect denied ownership of the
> property and whether he physically relinquished the property."  *United States
> v. Liu*, 180 F.3d 957, 960 (8th Cir. 1999).  Abandonment "is determined on the
> basis of the objective facts available to the investigating officers, not on the
> basis of the [defendants'] subjective intent."  *United States v. Tugwell*, 125
> F.3d 600, 602 (8th Cir. 1997), *cert. denied*, 522 U.S. 1061, 118 S.Ct. 721, 139
> L.Ed.2d 661 (1998).

*United States v. Caballero-Chavez*, 260 F.3d at 866-67.

In *United States v. Mitchell*, 429 F.3d 952 (10th Cir. 2005), defendant Angelia Mitchell

checked out of her motel room and fled, leaving some of her belongings in the room, after

she became aware the police had impounded her vehicle because it displayed stolen license

plates.  The defendant's room was actually registered to a man named Cedric Wilkins;

however Mitchell had been paying for the room and had been staying there for over a week.

A motel clerk advised officers of Mitchell's interest in the impounded vehicle, but Mitchell

checked out of the motel before they arrived to interview her.  The clerk told the officers that

Mitchell had checked out and gave the officers a key to the room.  The officers entered the

room and found papers and other personal items immediately visible on the floor and table.

There was clothing in a pile on the floor of the closet.  The officers found two personal checks, neither of which was written by or payable to Mitchell.  One of the checks was sitting in a chemical solution used to remove ink.  The police obtained a warrant to search Mitchell's vehicle, where they discovered a check printer machine and a folder containing the medical records of a female other than Mitchell.  The checks found in the room and the medical file found in the vehicle had been taken from a United States Postal Service collection box in Murray, Utah a week before.

Mitchell was charged with two counts of possessing stolen mail.  She moved to suppress all the evidence seized from the motel room.  After finding that Mitchell had, in fact, checked out before the room was searched, the trial court denied the motion, finding that Mitchell had abandoned the room and its contents prior to the search.  This finding was affirmed on appeal:

> At issue on appeal is whether Ms. Mitchell abandoned Room 266 and its contents before it was searched by the police, and therefore lacks standing to challenge the search. *See United States v. Garzon,* 119 F.3d 1446, 1449 (10th Cir. 1997) ("[A] defendant lacks standing to complain of an illegal search or seizure of property which has been abandoned.").  The test for abandonment is whether the defendant has retained any reasonable expectation of privacy in the property. *United States v. Burbage,* 365 F.3d 1174, 1178 (10th Cir. 2004). "An expectation of privacy is a question of intent which may be inferred from words, acts, and other objective facts." *United States v. Hernandez,* 7 F.3d 944, 947 (10th Cir. 1993).

*United States v. Mitchell*, 429 F.3d at 958.  The Court of Appeals acknowledged that Mitchell had a reasonable expectation of privacy in the room during her stay, but that expectation did not extend beyond the time when she checked out of the motel. *Id*. The

court further rejected Mitchell's argument that the presence of her personal belongings in the at the time of the search proved she was still occupying the room.  Based on evidence that Mitchell was a convicted felon, checked into the motel under someone else's name, had a stolen license plate on her car, became "really upset" and checked out of the motel when she learned that the police had impounded her car,

> it [was] not unreasonable to suspect that Ms. Mitchell was fleeing from the police at the time she checked out of the motel, and that in the rush to escape she left behind some of her belongings.  Consequently, the fact that some of her personal items were still in the room at the time of the search does not make the district court's decision clearly erroneous.

*Id*. at 959.

In the case at bar, Mr. Freemont was a guest or invitee of the woman who actually rented the room.  Although they did not believe there was a hostage in the motel room, the police officers had no reason to disbelieve Budlong's report that Freemont had pointed a shotgun at her through the sliding glass door.  When confronted, Freemont fled from the room through the back door, and the circumstances strongly suggest that he did not intend to return.  As in *Mitchell*,  the defendant was fleeing from the police at the time he left the motel, and in the rush to escape he left behind some of his belongings.

Keeping in mind that abandonment is determined on the basis of the objective facts available to the investigating officers, and not on the basis of the defendant's subjective intent, *see United States v. Caballero-Chavez*, 260 F.3d at 867, I find that Brian Freemont

-13-

abandoned any legitimate expectation of privacy in the motel room and its contents when he fled.  I will recommend that the motion to suppress be denied on that ground.

### B.   "Protective Sweep"

If the district court determines that the defendant did have an expectation of privacy and is entitled to challenge the search of the motel room, the court must consider the government's argument that the warrantless entry and search were permissible.  The burden of proving the legitimacy of a warrantless search is on the government.  *See United States v. Parris*, 17 F.3d 227, 229 (8th Cir.), *cert. denied*, 511 U.S. 1077 (1994).

The government contends the search of the motel room was permissible due to exigency or as a protective sweep under *Maryland v. Buie*, 494 U.S. 325 (1990).   In *Maryland v. Buie*, the Court defined a "protective sweep" as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."  494 U.S. at 327.  The Fourth Amendment permits a protective sweep if the searching officer possess a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrants the officer in believing that the area swept harbored an individual posing a danger to the officer or others.  *Id.*

The Eighth Circuit has interpreted *Maryland v. Buie* as follows:

> In *Buie* the Supreme Court established a two-prong test for determining whether a protective sweep incident to an arrest was constitutionally

permissible.  First, the *Buie* Court held "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." 494 U.S. at 334. Second, the Court permitted a broader sweep "when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337.  In either circumstance, a protective sweep "is not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found.  The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger ...." *Id.* at 335-36.

> *Buie* authorizes protective sweeps for unknown individuals in a house who may pose a threat to officers as they effectuate an arrest; **_Buie_ does not allow a protective sweep for weapons or contraband.**  *See United States v. Noushfar,* 78 F.3d 1442, 1448 (9th Cir. 1996); *United States v. Blue,* 78 F.3d 56, 60-61 (2d Cir.1996); *United States v. Ford,* 56 F.3d 265, 270 (D.C. Cir.1995); *United States v. Mains,* 33 F.3d 1222, 1227 (10th Cir. 1994).

*United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005).

In the case at bar, Freemont was in custody and his two female friends were in handcuffs when the officers searched under the mattress looking for the shotgun.  Under *Buie*, as interpreted by the Eighth Circuit, a protective sweep may extend only to a cursory inspection of those spaces where a person may be found.  On the evidence presented, I find that this search exceeded the scope of the "protective sweep" allowed under *Maryland v. Buie*.

I now turn to the government's contention that the search of the motel room was justified by exigency.  "A warrantless search is reasonable when justified by both probable cause and exigent circumstances." *United States v. Parris*, 17 F.3d 227, 229 (8th Cir.), *cert. denied*, 511 U.S. 1077 (1994); *accord United States v. Walsh*, 299 F.3d 729, 733 (8th Cir.

-15-

2002).  Under the exigent circumstances exception, "the warrant requirement is suspended 'when–in the press of circumstances beyond a police officer's control–lives are threatened, a suspect's escape looms, or evidence is about to be destroyed.'"  *United States v. Johnson*, 12 F.3d 760, 764 (8th Cir. 1993), *cert. denied*, 512 U.S. 1211 (1994)  (citations omitted).  "The exigent circumstances exception to the warrant requirement is narrowly drawn," *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996), and the government bears the burden of establishing that exigent circumstances existed.  *Id*.

In this case it appears that the officers may have had reason to believe that Freemont had threatened Paula Budlong by pointing a shotgun at her; however, by the time they entered the motel room, Freemont had run away and they did not believe there was any hostage in the room.  The shotgun was not in plain view, and the female occupants of the room were quickly secured without incident.  The circumstances do not suggest that, in the press of circumstances beyond the officers' control, lives were threatened, a suspect would escape, or evidence was about to be destroyed.  Thus, before conducting a thorough search for the reported shotgun, the officers were required to obtain a search warrant.

## CONCLUSION

I believe that Mr. Freemont abandoned any reasonable expectation of privacy as a guest in the motel room by fleeing from the scene.  For that reason, he is not entitled to challenge the search of the room, and I will recommend that the Motion to Suppress be denied.  However, if the district court, on *de novo* review, concludes that Freemont did not

-16-

abandon the premises and is entitled to contest the search, I do not believe the warrantless search can be justified by exigency or as a protective sweep under *Maryland v. Buie*.

**IT IS RECOMMENDED** that defendant's Motion to Suppress Evidence [11] be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED July 27, 2006.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**

-17-